**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALICIA MARSHALL, DANIEL PRONSKY, PARIS TOWNSEND, NANCILEE HOLLAND, LEONA OWSLEY, KOLAWOLE AHMADOU, KIANA DERVIN, KRISTINA HENDERSON, DUSTIN INNIS, KELLY STALNAKER and JAMIE JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PRESTAMOS CDFI, LLC,<br><br>Defendant. | Civil Action No. 5:21-cv-04337-JMG |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO PRESTAMOS CDFI, LLC'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Table of Contents

Introduction.................................................................................................................... 2

Statement of Facts.......................................................................................................... 4

Argument ........................................................................................................................ 8

    A.    Plaintiffs Have Standing ...................................................................................... 8

    B.    Plaintiffs' Claims Are Not Preempted or Precluded........................................... 13

    C.    Plaintiffs Properly Allege Breach of Contract Claims........................................ 18

    D.    Plaintiffs' Claims Are Not Released................................................................... 24

    E.    Plaintiffs Properly Allege State Law Consumer Protection Claims .................... 26

        1.    The California Subclass ........................................................................... 26

        2.    The Illinois Subclass ............................................................................... 30

        3.    The Ohio Subclass .................................................................................. 33

Conclusion .................................................................................................................... 35

<u>Introduction</u>

This is a private civil class action.  But it is about as close as it can be to a vitally important public law enforcement proceeding.  And the public policy, social and economic stakes are just as high, and extend nationwide.

Plaintiffs allege that Defendant failed to fund their U.S. Small Business Association ("SBA")-approved Paycheck Protection Program ("PPP") loans.  Defendant agreed to fund 494,415 PPP loans totaling over $7.6 billion in PPP loan proceeds, and made nearly $1.2 billion in fees.  Plaintiffs' Amended Complaint quotes scores of other similarly situated SBA-approved but unfunded borrowers also locked into Defendant by virtue of the PPP rules, and brings this action on behalf of all such borrowers -- the vast bulk of whom are the very small, minority and women business owners Congress designed the PPP to help amid COVID-19, and for which this class action is likely their last chance to obtain even any relief.

And on the flip side, Plaintiffs also candidly admit and even allege that, at this stage, Plaintiffs do not yet know exactly how many class members there are, how many SBA-approved PPP loans Defendant failed to fund, the total amount of the unfunding, or where -- also critically -- the unfunded proceeds even are.  Defendant has not disclosed anything about any of this yet, although Plaintiffs have now long sought that very information in discovery but have been totally stonewalled to date.  *See* ECF 22, 27.

Defendant's motion to dismiss does not deny, or even address, any of this.  Instead, it attempts to divert the Court's attention, throw all it can up, and see what it can try to get to stick to escape even *answering* -- all in circumstances where, indisputably, its misconduct is egregious and potentially even criminal assuming the truth of the allegations as is the rule, of course, at this procedural stage.  None of Defendant's arguments provides a basis for dismissal.

First, the defense that Plaintiffs lack standing is contrary to fact, caselaw and logic. Plaintiffs have been denied not only vital PPP loans for their businesses but also are now on the hook to pay back money to Defendant on loan proceeds they never received. Once approved by the SBA and contracted with Defendant, they were locked into, and thus had to rely exclusively on, Defendant's good faith to actually fund their loans. And once SBA-approved and under contract, they could not even apply for forgiveness because they could not truthfully represent they properly used loan proceeds they never received in the first place. Clearly that alleges potentially cognizable injury traceable directly to Defendant's failure to fund.

Second, the fact that Congress passed the CARES Act without creating a private right of action does not mean it intended to preempt or preclude state law claims. Defendant argues preemption through the back door, but quite tellingly fails to even address, much less demonstrate, that it meets the applicable standards -- or even discuss a recent case of this Court that is spot on and flatly counters the arguments it makes.

Third, the breach of contract claims are sufficiently alleged. The very contracts at issue not only bound the parties here, but also no doubt served Defendant in successfully funding millions or billions of dollars (again, Defendant has not disclosed any of this yet) in PPP loans for those more fortunate than Plaintiffs and the class. The consumer protection law claims are also narrowly and sufficiently alleged, including for equitable relief in the alternative to comply with applicable law, as with plaintiffs Marshall's and Townsend's claims under the California Unfair Competition Law (the "UCL"). Indeed, Plaintiffs are from ten states, but allege only three state consumer protection subclasses given the differences in state consumer protection statutes and, unlike Plaintiffs' contract claim, the unavailability of a nationwide class for those claims.

3

In sum, Defendant's motion should be denied in full, and Plaintiffs should be permitted to start getting truthful answers in discovery to the many critical issues in this case.

Statement of Facts

On March 27, 2020, following the worldwide outbreak of COVID-19, Congress passed the Coronavirus Aid, Relief and Economic Security Act ("CARES Act") to provide over $2 trillion in immediate assistance to individuals, families and businesses. ¶ 26.[1]  An integral part of the CARES Act was the PPP.  Administered by the SBA, the PPP authorized the making of a total of $813.7 billion in PPP loans through May 31, 2021.  ¶ 30.  PPP loans are guaranteed by the SBA and are designed to be completely forgiven.  To ensure that small businesses and sole proprietors received their PPP loan proceeds quickly and efficiently, the SBA delegated lending to authorized private PPP lenders and required PPP loans to be funded within ten days of SBA approval.  ¶ 39.  In return for processing PPP loans, the SBA paid PPP lenders loan processing fees for each loan made.  ¶ 33.

Defendant was one of the SBA's authorized PPP lenders.  In 2020, Defendant processed only 935 PPP loans totaling less than $27 million gross, and generated loan processing fees of $1.3 million.  ¶ 6. On December 27, 2020, however, the PPP loan processing fee structure was changed to address PPP lenders' neglect of PPP loan applications from sole proprietors and other small businesses -- especially minority, underserved, veteran and women-owned businesses.  ¶ 35.  Whereas originally the PPP provided that lenders would receive a five percent fee for loans of $350,000.00 or less, the December 27, 2020 change increased the fee to fifty percent or $2,500.00, whichever is less, for PPP loans of up to $50,000.00.  As the vast majority of PPP

---

[1]    Unless otherwise noted, all paragraph references are to paragraphs in Plaintiffs' Amended Complaint (ECF 18); all page cites are to the ECF page number; all emphases are in the original; and all internal quotation marks, alterations, footnotes and citations are omitted.

loans exceeded $5,000.00, PPP lenders received a flat fee of $2,500.00 for virtually every PPP loan less than $50,000.00.  ¶ 36.

Considering the incredible demand that existed for PPP loans by underserved small businesses and the much more lucrative fee schedule, Defendant saw an opportunity to obtain substantial lender fees by booking a high volume of PPP loans under $50,000.00.  Defendant also contracted with Blue Acorn PPP, LLC (or its affiliates) in 2021 to help identify new potential PPP borrowers and assist in the paperwork.  ¶ 55.

Defendant succeeded in its plan to exploit the higher fee schedule on smaller PPP loans. The 494,415 PPP loans it agreed to fund in 2021 for over $7.6 billion represented more loans than any other lender, and more than Bank of America, PNC Bank, TD Bank and Wells Fargo *combined*.  ¶ 61.

To facilitate PPP lending, the Federal Reserve advanced the funds to Defendant through term loans secured by PPP loans.  ¶ 63.  PPPLF advances could only be secured by SBA-guaranteed PPP promissory notes, and the principal amount advanced equaled the principal amount of the PPP loan pledged to secure the advance.  ¶ 67.  In total, Defendant received $7,144,136,133.27 from the PPPLF to fund PPP loans.  ¶ 71.

Plaintiffs are sole proprietors engaged in various lines of business across the country. Plaintiffs all sought the benefits of PPP loans to help with their businesses amid COVID, and allege that they each:

- timely applied for a PPP loan with Prestamos in 2021;

- had his or her PPP loan application approved by the SBA;

- signed and returned to Defendant all required Loan Documents as alleged (¶ 78; ECF 18-1) namely, the standard form Note, an Additional and Correction Documents Agreement (Errors and Omissions Agreement) (the "Additional Agreement"); a Business Purpose Statement; a Notice – No Oral Agreements

signed by Defendant's President Jose Martinez ("Martinez") and each Plaintiff; a Written Consent of Governing Body form; an IRS W-9 form; and an Information and Bank Account Certification and Authorization form; and

- failed to *ever* receive his or her SBA-approved PPP loan proceeds from Defendant despite completely performing pursuant to the terms of the Loan Documents.

While contradictorily relying on a provision in the Note purporting to release it from liability (ECF 24-1 at 22-24), Defendant contends that there was no contract and that it was not obligated to actually fund any PPP loans.  But that contention is belied by the explicit terms of the Loan Documents and applicable PPP rules.  In particular, each promissory Note:

- identifies the specific SBA-approved PPP loan, loan number, and loan amount;

- specifies that the parties are, respectively, each Plaintiff "Borrower" and the "Lender" Defendant Prestamos;

- states that, "[*i*]*n return for the Loan*, Borrower promises" to pay the principal plus "interest on the unpaid principal balance, and all other amounts required by this Note" back to Defendant if not forgiven (emphasis added);

- contains other loan repayment terms and events of default and the lender's rights in the event of default and other provisions, including that "[a]ll individuals and entities signing this Note are jointly and severally liable"; and

- states that, "[b]y signing below, each individual or entity becomes obligated under this Note as Borrower."  *See* ¶¶ 219-20; Dkt. 18-1 (attaching plaintiff Marshall's standard form Note and other Loan Documents in full).

Similarly, the Additional Agreement states that, "[i]n consideration of Prestamos CDFI, LLC … *making the above loan*, each of the undersigned, jointly and severally, do hereby agree as follows …."; identifies the loan amount; obligates each Plaintiff class member borrower to deliver other documents "*pertaining to the above loan*"; and states that Defendant "is relying on this agreement *in making the above loan* …."  ¶ 221 (emphasis added).

The "Notice - No Oral Agreements" identifies each Plaintiff and the SBA-approved loan amount; governs the "**Loan by Lender, Prestamos CDFI, LLC to Borrower**"; states that

"**THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT**

6

**BETWEEN THE PARTIES ...";** defines the term "Loan Agreement"; and is executed by both parties. ¶ 222. And the Information and Bank Account Certification and Authorization form identified the borrower's account and routing numbers for Defendant "to deposit the loan proceeds on the [Plaintiff] company's behalf." ECF 18-1 at 14. In addition, applicable PPP rules are incorporated in the Loan Documents and affirmatively bound PPP lenders to disburse the loans. *See, e.g.*, 86 Fed. Reg. 3692, 3710 ("The lender *must* make a one-time, full disbursement of the PPP loan within ten calendar days of loan approval") (emphasis added).

Despite these irrefutable facts, Defendant not only refused to fund any of Plaintiffs' PPP loans, but also failed to fund despite numerous follow-up attempts by many Plaintiffs. *See, e.g.*, ¶¶ 84-87, 127-131, 177-199. As a result, Plaintiffs' businesses were damaged by being deprived of PPP loan amounts to which they were contractually entitled; by being obligated to pay back to Defendant loan proceeds they never received; and by being unable to even properly apply for loan forgiveness on funds they never received. *See, e.g.*, ¶¶ 97-99. Defendant's commitment to fund Plaintiffs' and other class member borrower SBA-approved loans also prevented them from securing PPP loans from other PPP lenders. ¶¶ 42-44.

The Amended Complaint details numerous other complaints by borrowers Defendant failed to fund. *See* ¶¶ 203(a)-(g); 204(a)-(ww). Accordingly, Plaintiffs allege that Defendant's failure to fund their PPP loans breached the parties' standard form Loan Document contracts of all similarly situated class member borrowers nationwide (¶¶ 207(a), 218-234), and violated the consumer protection statutes of California, Illinois and Ohio. ¶¶ 207(b)-(d), 235-272.

Finally, while Defendant's nearly $1.2 billion in PPP loan fees included fees from Plaintiffs' and other PPP loans it failed to actually fund (¶ 62), Plaintiffs "are unaware" where their unfunded loan proceeds are or what Defendant did with them. ¶ 206. And to date,

7

Defendant has successfully thwarted even *any* meaningful discovery on these critical issues precisely as Plaintiffs previously advised the Court.  *See* ECF 22, 27.

Argument

At the dismissal stage, courts "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Allstate Prop. & Cas. Ins. Co. v. Dynamic Sols. Worldwide, LLC*, 2020 WL 6940884, at *2 (E.D. Pa. Nov. 25, 2020).  "[W]here there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010).  Defendant cites *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 896 (3d Cir. 1977), to support its subject matter jurisdiction challenge (ECF 24-1 at 12), but ignores that the court there reversed dismissal, holding that Rule 12(b)(1) motions "prior to giving the plaintiff ample opportunity for discovery should be granted only sparingly."

    A.    <u>Plaintiffs Have Standing</u>

Defendant contends that Plaintiffs lack standing because they were not injured.  But the extent of Plaintiffs' damages at issue delves into the merits and is thus improper at this procedural stage.  *See Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 479 (3d Cir. 2018), ("our standing inquiry must avoid any consideration of the merits beyond a screening for mere frivolity"); *Irizarry v. United States*, 2019 WL 4785738, at *4 (D.N.J. Sept. 30, 2019) (the court's jurisdiction is "intertwined with the merits"; denying motion to dismiss).

As this Court recognized in *Talbert v. Am. Water Works Co.*, 538 F. Supp. 3d 471, 482 (E.D. Pa. 2021), the injury-in-fact element of standing that is the focus of Defendant's argument "is 'very generous to claimants, demanding only that the claimant allege[ ] some specific, identifiable trifle of injury' … 'Monetary harm is a classic form of injury-in-fact,' and that is

8

exactly what Plaintiffs have alleged here." *Accord Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) ("Monetary harm is a classic form of injury-in-fact. … Indeed, it is often assumed without discussion.)"; *CNA v. United States*, 535 F.3d 132, 145 (3d Cir. 2008) ("district courts ensure that they do not prematurely grant Rule 12(b)(1) motions to dismiss claims in which jurisdiction is intertwined with the merits and could be established, along with the merits, given the benefit of discovery").

Even if considered, Defendant's merits argument that it is not liable for any "delay" in funding Plaintiffs' loans provides no basis for dismissal.  The claim is that Defendant failed to fund those loans.  There is no evidence in the record that Defendant is still considering whether to fund the loans.  Defendant has said nothing about belatedly funding even during the five months since Plaintiffs filed their initial complaint.  There is also no evidence in the record that any of Plaintiffs' PPP loan funding has been complicated by what Defendant claims are efforts to comply with "expansive eligibility criteria" or anti-money laundering requirements.  *See* ECF 24-1 at 13-14.  Conversely, there are detailed allegations in the record that Plaintiffs' and absent class members' efforts to determine the status of their loans have been met with Defendant's silence.  *See* ¶¶ 84-87, 127-131, 177-179, 203(f), 203(g), 204(b), (d), (f), (g), (j), (v), and (x).

And contrary to Defendant, improper delay itself can be actionable.  *See, e.g*., *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 829 (7th Cir. 2020) ("[w]hen a contract does not specify a deadline for performance, a reasonable time will be implied."); *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016) ("when a factual challenge to jurisdiction attacks facts at the core of the merits of the underlying cause of action, the proper procedure for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the

9

plaintiff's case"); *Pontes v. Rowan Univ.*, 2021 WL 4145119, at \*4 n.5 (3d Cir. Sept. 13, 2021) (a "temporary loss of use of money is itself a sufficiently concrete injury to establish standing").

Defendant relies on *Pinehurst Neuropsychology, PLLC v. First-Citizens Bank & Tr. Co.*, 2021 WL 4460273 (M.D.N.C. Sept. 29, 2021) and *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742 (D. Md. 2020). But those cases involved applicants for PPP loans, not contractually-entitled, SBA-approved borrowers bound by the Loan Documents. *See Pinehurst,* 2021 WL 4460273 at \*4 (plaintiff "failed to allege that it was delayed in receiving funds *to which it was entitled*") (emphasis added); *Profiles,* 453 F. Supp. 3d at 746 (alleging that defendant *might* deny their loan applications). In fact, one plaintiff in *Profiles* was forced to dismiss his claim when the defendant funded his loan, *id.* at 755, and the plaintiffs in *Profiles* were all early PPP applicants who, unlike Plaintiffs here, had plenty of additional time to seek PPP loans.

Defendant's other contentions in this context fare no better. As to traceability, Plaintiffs do not claim that Defendant is responsible for all of their losses occasioned by the COVID pandemic. ECF 24-1 at 15. Plaintiffs allege that Defendant is responsible for the amount of their unfunded loans, particularly given their exclusive reliance on Defendant to actually fund and their inability to secure PPP loans from other sources. *See* ¶¶ 42-44, 96.

The fact that Plaintiffs were contractually entitled to their PPP loans and locked-into Defendant to fund them also distinguishes *Elizabeth M. Byrnes, Inc. v. Fountainhead Com. Cap., LLC*, 2021 WL 5507225, at \*4 (C.D. Cal. Nov. 24, 2021) ("It is far from certain that Plaintiff suffered any injury, as she does not allege that she was unable to obtain a loan from another source or how much of a delay she suffered as a result of Fountainhead's conduct."). Here, the PPP was closed in May 2021. But even if Defendant's defenses were relevant, they would not

10

be determinative at this early stage.  *See PetroChoice Holdings, Inc. v. Orobono*, 2022 WL

138008, at *8 (E.D. Pa. Jan. 14, 2022), (Gallagher, J.) ("[w]hether causation has been established

in a breach of contract action … is normally a question of fact for the jury; the question is to be

removed from the jury's consideration only where it is clear that reasonable minds could not

differ on the issue.").

Defendant also contends that the Amended Complaint "provides no detail whatsoever as

to the nature or extent of the harm Plaintiffs purportedly suffered."  ECF 24-1 at 15.  But

Plaintiffs allege they were deprived of funds that would have directly assisted in the operation of

their businesses; left them obligated to repay PPP loan funds they never received; and precluded

them from lawfully applying for forgiveness.  *See*  ¶¶ 97-99, 109, 118, 132, 141, 150, 159, 168,

180, 189, 201.  Far from being "too speculative" as Defendant asserts (ECF 24-1 at 15 n.5), these

allegations clearly allege injury fairly traceable to Defendant's failure to fund.  *See Davis by*

*Davis v. Philadelphia Hous. Auth.*, 121 F.3d 92, 96 & n.6 (3d Cir. 1997) (standing properly

alleged based on concrete harm redressible by monetary damages).

Defendant's claim that Plaintiffs lack standing to assert nationwide breach of contract

claims fares no better.  The Third Circuit, this Court and other courts have repeatedly held that,

"[i]n the class action context, our standing inquiry focuses solely on the class representative(s)."

*Mielo,* 897 F.3d at 478.  *See also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir.

2015) (citing *Mielo*; "unnamed, putative class members need not establish Article III standing.

Instead, the 'cases or controversies' requirement is satisfied so long as a class representative has

standing, whether in the context of a settlement or litigation class."); *In re Horizon Healthcare*

*Services Inc. Data Breach Litigation*, 846 F.3d 625, 634 (3d Cir. 2017) ("The requirements for

standing do not change in the class action context.  '[N]amed plaintiffs who represent a class

must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"); *Bombin v. Southwest Airlines Co.*, 529 F. Supp. 3d 411, 418-19 (E.D. Pa. 2021) (Gallagher, J.) (accord; citing *Horizon*); *Bodor v. Maximus Fed. Servs., Inc.*, 2021 WL 4941503, at *2 (E.D. Pa. Oct. 22, 2021). (Gallagher, J.) (accord; citing *Horizon*).

Rather than acknowledge controlling precedent, Defendant's cases largely pre-date it, and raise issues beyond those raised by the common law contract claims at issue here. *See* ECF 24-1 at 16-17. In *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 156 (E.D. Pa. 2009), the parties disputed plaintiffs' standing to assert claims under "various state statutes." *Lauren v. PNC Bank, N.A.*, 296 F.R.D. 389, 390 (W.D. Pa. 2014), was decided before *Mielo*, and the court accordingly observed that "[t]here is no binding Third Circuit precedent directly on point." The court in *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *8-*9 (D.N.J. Oct. 2, 2013), considered state antitrust and consumer protection law claims. Only *Talbert,* 538 F. Supp. 3d 471, is recent by comparison. But unlike this case which arises from a standard-form contract and alleged breaches that, if proven, would similarly and uniformly result in liability under the laws of every jurisdiction, the plaintiffs in *Talbert* "do not attach any contract or identify any essential terms of a contract." *Id*. at 489. Further, *Talbert* involved alleged contaminants in the water supply of two plaintiffs, one located in Pennsylvania and the other in New Jersey, and the Court therefore held that is where they were allegedly injured. *Id*. at 482. Here, by contrast, the alleged misconduct is by definition indisputably national in scope. Additionally, the parties in *Talbert* appear to have cited no Third Circuit authority, *see id.*, No.

12

2:19-cv-05010, ECF 6 at 29-30 (defendants' opening brief); ECF 21 at 9 (defendants' reply brief).[2]  And the Court's opinion in *Bodor* both cites *Horizon* and post-dates *Talbert*.

B.        Plaintiffs' Claims Are Not Preempted or Precluded

Defendant argues that the CARES Act preempts Plaintiffs' state law claims.  But it fails to address, much less demonstrate, that any criteria for preemption have been satisfied, or even mention that word in its brief.

Courts recognize three categories of preemption -- express, conflict, and field preemption.  *See Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020).  Defendant does not contend that the CARES Act expressly preempts Plaintiffs' state law claims or that Plaintiffs' claims conflict with the CARES Act, nor reasonably could it.  *See Freightliner Corp. v. Myrick,* 514 U.S. 280, 287 (1995) (finding conflict preemption where "it is impossible for a private party to comply with both state and federal requirements," or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Rolon v. Metropolitan Life Ins. Co*., 2022 WL 35609, at *4 (E.D. Pa. Jan. 4, 2022) (Gallagher, J.) ("Under the principles of implied conflict preemption, a state law is preempted when it conflicts with a federal law such that dual compliance is impossible or when it stands as an obstacle to the federal statute's objective.").

Instead, Defendant appears to claim field preemption premised only on the undisputed fact that "the CARES Act and related rules already provide a robust enforcement scheme" (ECF 24-1 at 18).  The black letter rule, however, is that robust federal enforcement alone does not result in preemption.  Rather, field preemption is found only "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for

---

[2]        Plaintiffs' opposition brief (ECF 18) in *Talbert* is not available to the public.

13

the States to supplement it.'"  *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992); *see also Garcia,* 140 S.Ct. 806-807 ("In the end … the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption.").  State law commonly supplements federal law in many areas of commerce that are also heavily regulated at the federal level.  For example, the federal antitrust laws are robustly enforced nationwide and even limit standing to direct purchasers only, *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977), yet the Supreme Court has also recognized that federal antitrust law does not preempt or displace indirect purchasers' rights to seek damages under applicable state law.  *See California v. ARC America Corp*., 490 U.S. 93, 101 (1989).

Here, Defendant cites nothing in the CARES Act suggesting that Congress left no room for state law, or that Plaintiffs' state law claims "threaten[] serious disruption" to any aspect of PPP lending or the CARES Act. *Garcia* 140 S.Ct. at 807.  To the contrary, section 7 of the standard form Note contained in the parties' Loan Documents affirmatively *incorporates* state law into the parties' agreement, and actually precludes borrowers from claiming that federal law preempts state law against the SBA.  *See* Dkt. 18-1 at 5 ("Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, *and for other purposes*.") (emphasis added); "As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.").

This Court's ruling in *Rolon,* 2022 WL 35609, is spot on. *Rolon* involved disputed life insurance proceeds under a program created for certain federal employees by the Federal Group Life Insurance Act of 1954 ("FEGLIA").  Like the SBA and PPP lending, FEGLIA tasked a federal agency, the Office of Personnel Management ("OPM"), to implement the program.  The OPM, in turn, retained private insurers including defendant to administer the claims and pay the

14

insurance proceeds "in accordance with the requirements and conditions of FEGLIA, the OPM's regulations and the FEGLIA Contract." *Id*. at *1. Defendant argued that plaintiffs' claims were expressly and impliedly preempted by FEGLIA. The Court held that "neither of these arguments is persuasive because Plaintiffs' breach of contract claim is entirely consistent with the FEGLIA Contract and FEGLIA itself." *Id*. at *3. The Court stated as follows (*id*. at *4):

> "Defendant's express preemption argument must fail because there is no inconsistency between state law causes of action for breach of contract and the FEGLI Contract's terms. Indeed, the whole purpose of a breach of contract claim is to *enforce* a contract's provisions, not to alter them. The FEGLI contract does not contain any clause precluding judicial review or compelling non-judicial enforcement -- in fact, the FEGLI contract seems to contemplate judicial enforcement."

Likewise here, there is no inconsistency between Plaintiffs' state law claims and federal law; indeed, as in *Rolon*, the whole purpose of Plaintiffs' state law claims is to seek to enforce federally-created PPP lending obligations for the Plaintiffs and other similarly situated SBA-approved but unfunded borrowers, not alter or interfere with them. *Id*.

Further, a specific section of the CARES Act relating to protecting healthcare workers actually preempts state law "unless such laws provide greater protection from liability." *See* CARES Act § 3215(c)(1). At least one court has held that this evidences Congressional intent for the CARES Act to not otherwise displace state law. *See Adams v. McMaster*, 851 S.E.2d 703, 712 (S.C. 2020). *Cf. Rolon*, 2022 WL 35609, at *4 (stating that since "FEGLIA does not supply its own cause of action that could displace state law causes of action" and that "one purpose of FEGLIA's statutory design is to ensure that beneficiaries receive the insurance proceeds to which they are entitled …, it would be entirely consistent to allow beneficiaries to bring state law causes of action for breach of contract to enforce that contract"); *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one

section of a statute but omits it in another …, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Defendant is also incorrect that the absence of a private right of action in the CARES Act precludes Plaintiffs' claims. Again although not addressed in Defendant's motion, the rule in the Third Circuit and elsewhere is that the absence of a private cause of action from a federal statute does not mean that a state law claim is precluded relating to the federal statute. *See Bukowski v. Wells Fargo Bank, N.A.*, 757 F. App'x 124, 128-29 (3d Cir. 2018) (reversing dismissal of state law consumer protection and contract claims; "As the Seventh Circuit explained in *Wigod*, '[t]he absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law.'") (citing *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 581 (7th Cir. 2012) ("The issue here, however, is not whether federal law itself provides private remedies, but whether it displaces remedies otherwise available under state law.")); *accord Scott v. Gate Gourmet, Inc.*, 2021 WL 677897, *10 (C.D. Cal. Feb. 22, 2021) ("On balance, the Court finds the reasoning of *Wigod* persuasive. As such, the Court similarly finds that the absence of a private right of action from the CARES Act, which does not expressly prohibit state law claims, does not require dismissal of plaintiffs' common law claims …."); *Cave v. Saxon Mortgage Services, Inc.*, 2012 WL 1957588, *4 n.5 (E.D. Pa. May 30, 2012) (Padova, J.) ("Saxon first argues that HAMP has no private right of action, and thus Plaintiffs' claims fail. Plaintiffs, however, have not brought a claim under HAMP, but rather are trying to enforce only the terms of the TPP."); *Steven L. Steward & Assocs., P.A. v. Truist Bank & Truist Fin. Corp.*, 2020 U.S. Dist. LEXIS 187084, at *4-5 (M.D. Fla. Oct. 6, 2020) ("Plaintiff's Complaint alleges state law claims for unjust

16

enrichment and declaratory judgment -- not for violation of any federal statute.  Plaintiff only cites to the CARES Act to buttress these allegations.").

Defendant cites no case holding that the CARES Act preempts or precludes state law. Instead, it cites cases for the undisputed point that the CARES Act and other statutes do not contain a private right of action.  *See Profiles*, 453 F. Supp. 3d at 748; *Crandal v. Ball, Ball & Brosamer, Inc.*, 99 F.3d 907, 909 (9th Cir. 1996); *Autumn Court Operating Co. LLC v. Healthcare Ventures of Ohio*, 2021 U.S. Dist. LEXIS 18295, at *13-16 (S.D. Ohio Feb. 1, 2021); *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 67 (3d Cir. 2008) (federal tax statute); *Mankodi v. Trump Marina Assocs. LLC*, 525 F. App'x 161, 166 (3d Cir. 2013) (state statute).  It also cites cases involving claims to share in PPP loan fees by alleged agents who, unlike here, lacked any binding contract directly with PPP lenders.  *See Sanchez v. Bank of S. Tex.*, 494 F. Supp. 3d 421, 434 (S.D. Tex. 2020); *Johnson v. JPMorgan Chase Bank, N.A.*, 488 F. Supp. 3d 144, 149 (S.D.N.Y. 2020); *Radix Law PLC v. JPMorgan Chase Bank, N.A.*, 508 F. Supp. 3d 515, 520 (D. Ariz. 2020); *see also Gibbs v. SLM Corp.*, 336 F. Supp. 2d 1, 16 (D. Mass. 2004) ("the Complaint is devoid of any details about the alleged breach of contract").  But as in *Rolon***,** 2022 WL 35609 at *4, the absence of a federal private right of action renders state law enforcement even more important particularly here, without which Defendant may abscond with PPP proceeds and Plaintiffs and other SBA-approved but unfunded contractually-entitled intended beneficiary borrowers would lack any claim.

Defendant also relies on *Astra USA, Inc. v. Santa Clara Cnty.,* 563 U.S. 110, 118 (2011). But *Astra* did not address the CARES Act which is critical because, "[i]n determining whether a federal statute expressly preempts state law, a court must focus exclusively on the federal statute's text."  *Rolon,* 2022 WL 35609, at *4.  And unlike the CARES Act, *Astra* involved

17

comprehensive pharmaceutical pricing legislation and regulation that "'centralized enforcement in the government'" (*Astra,* 563 U.S. at 119), and required the federal agency "to create a formal dispute resolution procedure, institute refund and civil penalty systems, and perform audits of manufacturers." *Id*. at 121. The plaintiff in *Astra* also sued only as a third-party beneficiary to enforce a federal statute and did not allege that the defendants "violated any independent substantive obligation" to plaintiff. *Id*. at 119. Here, Plaintiffs allege independent and direct state law claims in their own right as parties to the Loan Documents which is a distinction in status that Defendant's own case recognizes. *See Johnson*, 488 F. Supp. 3d at 158 n.19 (S.D.N.Y. 2020) (citing *Astra*). And the federal regulation at issue in *Astra* precluded the federal agency from disclosing the applicable drug prices that plaintiff challenged, which the court found "is a further indication of the incompatibility of private suits with the statute Congress enacted." *Astra,* 563 U.S. at 121. Defendant points to no specific language in the CARES Act showing that Congress intended to displace state law. Here, in sum, Defendant's preemption and preclusion arguments are belied by the applicable legal standards, the CARES Act and the text of the parties' agreements that Plaintiffs seek to enforce.

      C.      <u>Plaintiffs Properly Allege Breach of Contract Claims</u>

Defendant's argument that Plaintiffs do not properly allege breach of contract claims ignores basic principles of contract construction, the express terms of the Loan Documents, the purpose and framework of the PPP and Defendant's own actions confirming -- *and reaping the benefits of* -- Plaintiffs' approved Loans. As a threshold matter, and stripped of its own confusion, Defendant tries to but cannot reasonably dispute the "existence of a contract" (ECF 24-1 at 20), but instead denies it obligated Defendant to fund Plaintiffs' loans. Either way, Defendant is incorrect. The Loan Documents are indisputably binding contracts obligating

18

Defendant to fund the PPP loans.  In fact, Defendant admits the contracts are binding by affirmatively seeking to enforce the release in the Note.  ECF 24-1 at 22-24.  Thus, Defendant cannot ignore the Note's other provisions.

Section 1 of the Note states that the consideration for the borrower's agreement is "the Loan."  ECF 18-1 at 2.  By seeking to enforce the Note *against* the Plaintiffs, Defendant is likewise bound to the existence of "the Loan" serving as consideration for the Note, and thus its commitment to actually fund Plaintiffs' loans.  *See, e.g., Mid-American Salt, LLC v. Morris Cnty. Coop. Pricing Council*, 964 F.3d 218, 232 n.4 (3d Cir. 2020) (Phipps, J., dissenting) ("Thus, if there is no other consideration for a return promise, the result is that no contract is created.").  Defendant cannot now change its position on reply and is bound by its admission that the Notes are supported by adequate consideration and enforceable.  *See Oberwager v. McKechnie Ltd.*, 351 F. App'x 708, 711 n.5 (3d Cir. 2009).

Defendant's motion should be denied on this basis alone.  But basic principles of contract interpretation also counter Defendant's position.  "When interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement."  *Doe v. Univ. of the Scis.*, 961 F.3d 203, 212 (3d Cir. 2020).  "Even in the interpretation of an unambiguous contract, [a court] may consider all of the relevant evidence that will assist in determining its intent and meaning."  *Fed Cetera, Ltd. Liab. Co. v. Nat'l Credit Servs.*, 938 F.3d 466, 469-70 (3d Cir. 2019).  Here, even absent any express funding commitment as Defendant contends, it is irrefutable that the central purpose of the Loan Documents is to fund Plaintiffs' loans.  *See, e.g., Gallagher v. Upper Darby Twp.*, 539 A.2d 463, 473 (Pa. Commw. 1988) (holding that "where an obligation was within the contemplation of the parties when making the contract or is necessary to carry out their intention,

19

the law will imply that obligation and enforce it even though it is not specifically and expressly set forth in the written contract"); *Hartford Fire Ins. Co. v. E.R. Stuebner, Inc*., 2022 WL 245237, at \*4 (E.D. Pa. Jan. 25, 2022) (Gallagher, J.) (citing terms of an agreement that suggested parties' reasonable expectations); *Bombin,* 529 F. Supp. 3d at 420 ("We must construe the contract from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive."); *Azer Sci. Inc. v. Quidel Corp.*, 2021 WL 5918655, at \*4 (E.D. Pa. Dec. 15, 2021) (Gallagher, J.) ("it is by now hornbook law that the test for enforceability of an agreement is whether both parties have manifested an intention to be bound").

Plaintiffs' loans cannot be viewed in a vacuum.  Indisputably, the PPP was intended to quickly and efficiently provide forgivable federally-backed loans to small businesses and sole proprietors adversely impacted by COVID-19.  The PPP streamlined the lending process  and required PPP lenders to fund SBA-approved PPP loans quickly.  PPP lenders were permitted to rely on borrowers' certifications in their applications.  ¶¶ 37-39.  And contrary to Defendant, PPP loan funding was not voluntary but mandatory as "[t]he lender *must* make a one-time disbursement of the PPP loan within ten calendar days of loan approval" and after receipt of the borrower's signed promissory note and other loan documents.  86 Fed. Reg. 3692, 3710 (emphasis added).  A lender would only be relieved of its obligation to fund if a borrower did not sign and submit loan documents.  ¶ 40.  Viewed within the PPP framework which incorporated lenders' funding commitment into the Loan Documents, Defendant's failure to fund within ten days, or at all, constituted a clear breach of its contractual obligations.  *See First Nat'l Bank v. Flanagan*, 528 A.2d 134, 137-38 (1987) ("substantive laws in effect when the parties enter into a contract are implicitly incorporated into it"); *Willisch v. Nationwide Ins. Co. of Am.*, 852 F. Supp.

20

2d 582, 607 (E.D. Pa. 2012) ("Statutes that pertain to the subject matter of a contract 'form a part of the contractual obligation as if actually incorporated into the contract.'"); *Heyman v. Citimortgage, Inc.*, 2019 WL 2642655, at \*24 (D.N.J. June 27, 2019) ("At this summary judgment stage, the Heymans are entitled to the benefit of an interpretation that would incorporate HAMP regulations as implied terms in the contract."); *Skurka Aero., Inc. v. Eaton Aero., L.L.C.*, 2011 WL 1135946, at \*8 (N.D. Ohio Mar. 26, 2011) (holding that "claim for breach of implied contract terms based on FAA Regulations … withstand[s] Rule 12(b)(6) scrutiny").

Congress specifically intended for SBA rules to govern PPP loans.  For example, PPP lenders were required to make PPP loans "under the criteria, terms, and conditions" set by the SBA rules and the CARES Act.  15 U.S.C. § 9008(g).  Defendant's argument that Plaintiffs' contract claims rely on an agreement between Defendant and the SBA is a red herring.  PPP rules are incorporated into the parties' Loan Documents by operation of law and Defendant was obligated to follow those rules.  But Plaintiffs' claim here is not for violation of the CARES Act but breach of Defendant's obligation under the Loan Documents to fund their loans.

The Loan Documents unquestionably obligated Defendant to fund Plaintiffs' Loans.  The Note identifies Defendant as the "Lender" and each Plaintiff as the SBA-approved "Borrower," and the SBA loan number and amount, payment terms, the lender's rights and other provisions, and was signed and submitted by each borrower and accepted by Defendant.  The Note states that "[*i]n return for the Loan*, Borrower promises to pay to the order of the Lender" the principal amount of the loan plus interest unless forgiven (emphasis added); the Additional Agreement states that "*[i]n consideration of Prestamos … (*hereinafter called 'Lender') *making the above loan …*" and contains other conditions "*pertaining to the above loan*" including "that Lender is

21

relying upon this agreement *in making the above loan* ….." (emphasis added); and the Information form identifies each Plaintiff borrower's account for Defendant to actually fund the loan. ¶¶ 220-223; ECF 18-1. Defendant also signed and delivered to Plaintiffs the Notice – No Oral Agreement which defines "Loan Agreement" to "mean[] one or more promises, promissory notes, agreements … or other documents or commitments … pursuant to which a financial institution loans … or agrees to loan" which also evinces Defendant's agreement to fund.

Defendant also acted consistent with, reaped the benefits of and made numerous representations confirming its agreement to fund Plaintiffs' loans. For example, Defendant does not dispute it obtained nearly $1.2 billion in PPP loan fees by representing to the SBA that it had funded Plaintiffs' and other PPP loans. *See* ¶¶ 45-47, 62. Nor does Defendant dispute it obtained more than $7 billion in loan proceeds from the PPPFL by pledging Plaintiffs' and other borrowers' loans as collateral. *See* ¶¶ 64, 67-68, 71. Defendant could not properly secure PPPLF advances on loans it would not fund. Defendant also consistently reported to the SBA that it had funded class members' loans. *See* ¶¶ 88-89. In sum, the fact that Defendant's failure to fund also implicates very serious SBA rule violations, among other potential consequences, does not mean Plaintiffs lack their own independent claims.

Based on the foregoing, Defendant is precluded by quasi-estoppel from arguing that it had not agreed to fund Plaintiffs' PPP loans. The doctrine of quasi-estoppel precludes a party from taking a position that is inconsistent with a position previously taken to obtain a benefit. *See Robb-Fulton v. Robb (In re Robb)*, 23 F.3d 895, 898 (4th Cir. 1994) ("'[Q]uasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects.'"). "The doctrine applies where it would be unconscionable to permit a person to maintain a position

22

inconsistent with one in which he acquiesced or where he accepted a benefit." *In re Guterl Special Steel Corp.*, 316 B.R. 843, 856 (Bankr. W.D. Pa. 2004); *accord Girard Estate Area Residents v. Def. Realty, LLC*,  2009 U.S. Dist. LEXIS 125983, at *87 (E.D. Pa. Mar. 17, 2009).

Quasi-estoppel may be pled as a separate claim or used to oppose specific legal arguments raised by a motion.  *See Cnty. Sch. Bd. v. RT*, 433 F. Supp. 2d 692, 704-05 (E.D. Va. 2006); *Mountain View Hosp., L.L.C. v. Sahara, Inc.*, 2011 WL 4962183, at *23-28 (D. Idaho Oct. 17, 2011).  The terms and purpose of the Loan Documents unquestionably obligated Defendant to fund Plaintiffs' loans, as did Defendant's acts and representations.

None of the cases Defendant cites are to the contrary.  Most concern loan agreements that could not be enforced for reasons not relevant to this case, and none consider the effect of the incorporation of the PPP statutory scheme into the contract upon which Plaintiffs rely.

For example, in *Krebs v. FDIC*, 851 F. Supp. 430, 435 (M.D. Fla. 1994), the court held that the FDIC, as receiver for the lender, was entitled by law to repudiate any agreement to fund certain mortgages.  *Brook v. Amaximis Lending, L.P. (In re Vickers)*, 275 B.R. 401, 406 (Bankr. M.D. Fla. 2001), involved a loan document containing a commitment to lend that was unsigned by the lender and thus unenforceable.  *Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commer. Mortg. Corp.*, 265 F. Supp. 2d 366, 381 (S.D.N.Y. 2003), also precluded a claim for breach of a loan agreement absent, unlike here, an express written promise to lend.  *Jericho All-Weather Opportunity Fund, LP v. Pier Seventeen Marina & Yacht Club*, *LLC,* 207 So. 3d 938, 941-42 (Fla. Dist. Ct. App. 2016), involved summary judgment, not a motion to dismiss, and the borrower intentionally excluded the binding commitment letter contract from its allegations to avoid a contractual prohibition on consequential damages.

D.    Plaintiffs' Claims Are Not Released

Defendant's contention that Plaintiffs have released their pending claims is also meritless. First, Defendant cannot credibly argue the release in the Note is operative while simultaneously maintaining it was not required to actually fund the very loans the Loan Documents committed it to fund.  A release cannot immunize a party who, as here, breached the parties' contract.  *See, e.g.*, *Horne v. Elec. Eel Mfg. Co.*, 987 F.3d 704, 718 (7th Cir. 2021) ("Horne is also correct that, under Illinois law, a party in material breach may not enforce a provision of a contract that is favorable to him, such as an exculpatory clause."); *Trumbull Corp. v. Boss Const., Inc.*, 801 A.2d 1289, 1292 (Pa. Commw. 2002) (citation omitted); (party seeking to enforce a contract "must prove that he has performed all of his obligations under the contract"); *Guardian Music Corp. v. James W. Guercio Enters.*, 459 F. Supp. 2d 216, 223 (S.D.N.Y. 2006) ("a contracting party cannot benefit from its own breach").

Second, the release explicitly applies only to alleged acts and omissions "on or prior to the date hereof" (ECF 18-1 at 6).  But Defendant's commitment to fund the PPP loans extended by definition after the date Plaintiffs' notes were executed; indeed, under the governing rules, the Defendant was required to fund within 10 days *after* SBA approval and after receipt of the Loan Documents.  *See* ¶ 39.  Since Defendant was required to fund the loans after it received the signed Loan Documents, Plaintiffs' claims for breach for failure to fund could only arise after Plaintiffs' Notes and other Loan Documents were executed and returned.  Defendant acknowledges this because its position is that it can belatedly fund the loans.  *See* 24-1 at 5.

Although the release is thus limited temporally, Defendant asks the Court to ignore its plain language on the premise that "it would defy all logic to read the release to subject Prestamos to liability for … misconduct occurring at the stroke of midnight the night the Note

24

was signed, but not that occurring before." ECF 24-1 at 24 n.8. Logical or not (and although Defendant has it backward as the release purports to operate *before* not *after* that stroke of midnight), that is exactly what the release says. And that language is common in commercial contracts, even those that, unlike here, are actually the subject of negotiations between the parties. *See, e.g.*, *Bowersox Truck Sales & Serv. v. Harco Nat'l Ins. Co.*, 209 F.3d 273, 279-80 (3d Cir. 2000) (releases should be "strictly construed"; "the court stretched the language of the Release beyond the words agreed upon by the parties"); *Neman Bros. & Assoc., Inc. v. Interfocus, Inc.*, 2022 WL 266049, at *6, *8 n.8 (C.D. Cal. Jan. 11, 2022) (releasing defendant for "activity that occurred prior to the execution" of the agreement); *Goldfarb Corp. v. Much, Shelist, Freed, Denenberg Ament & Rubenstein, P.C.*, 2016 IL App (1st) 132071-U, ¶ 17 (quoting similar release terms).

Defendant's contention that the Court should ignore the text of the release is contrary to a "cardinal principle of contract construction: that a document should be read to give effect to all its provisions…." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63 (1995). *Accord Dental Health Servs., Inc. v. Regulatory Ins. Advisors, LLC*, 2020 WL 7385735, at *2 (W.D. Wash. Dec. 16, 2020) (citing *Mastrobuono*). In fact, "parties may choose to relinquish even those claims that accrued after the signing of a release so long as that intention *is clearly expressed in the agreement*." *Custer v. Penn State Geisinger Health Sys.*, 102 F. App'x 758, 760 (3d Cir. 2004) (emphasis added).

Defendant asks the Court to assume that the words "any *extension of credit* … on or prior to the date hereof" encompasses the "extension of credit" otherwise provided for by the Note. But Plaintiffs' claims arise from Defendant's undisputed failure to extend credit after the Note was executed. *See, e.g.*, ¶ 90. Defendant implies that the mere offer of the Note constituted an

25

"extension of credit," absent any transfer of funds.  But that contention is unsupported and contrary to the explicit language of the release.

Moreover, "the general words of the release will not be construed so as to bar the enforcement of a claim which has not accrued at the date of release."  *Bowersox*, 209 F.3d at 279.  Plaintiffs' claim accrued no earlier than 10 days after the SBA approval and Plaintiffs returned their Loan Documents and were thereby entitled to funding.  A general reference to "extension of credit" -- as opposed to the "extension of credit" provided for by the Note itself -- cannot dictate the release of claims that had not yet even accrued.  And any release immunizing Defendant for failing to actually extend the credit would be unfair, against public policy and contrary to the goal of the PPP -- which even Defendant recognizes was "encouraging SBA-approved lenders to issue PPP loans to as many eligible borrowers as possible, with a particular focus on reaching the smallest businesses."  ECF 18-1 at 4.  *See Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017), ("[a] long line of Pennsylvania cases has held that a release covers only those matters which may be fairly said to have been within the contemplation of the parties when the release was given").

E.     Plaintiffs Properly Allege State Law Consumer Protection Claims

1.     The California Subclass

Any violation of a federal law or regulation alone may serve as a predicate for a UCL claim.  *See, e.g., Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463, 1480, 38 Cal. Rptr. 3d 653, 669 (2005), *as modified on denial of reh'g* (Jan. 26, 2006).  That rule encompasses Defendant's violation of the PPP rules requiring that PPP loans be timely funded.  *See, e.g., Sandoval v. PharmaCare US, Inc.*, 145 F. Supp. 3d 986, 994 (S.D. Cal. 2015) ("Plaintiff [properly] alleges a violation of FDA regulations … and a resulting violation of the unlawful prong of the UCL."); *Albillo v. Intermodal Container Serv., Inc.*, 2000 WL 35436363, at *18

26

(Cal. Super. Ct. Sept. 20, 2000), *aff'd in relevant part,* 114 Cal. App. 4th 190, 8 Cal. Rptr. 3d 350 (2003) (violation of Truth in Leasing Regulations was "an 'unlawful' business practice pursuant to section 17200").  This distinguishes Defendant's cases which did not involve any regulatory violations.  *See* ECF 24-1 at 25.  Further, in *Pinehurst,* 2021 WL 4460273, at *2, the SBA actually denied plaintiff's loan application, and nothing in the court's opinion reflects that plaintiff even alleged a UCL claim.

The fact that SBA regulations do not provide for a private right of action has no bearing. As the court recognized in *LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc.*, 2019 WL 160335, at *13 (N.D. Cal. Jan. 10, 2019), "California courts have repeatedly stated that a plaintiff may bring a UCL claim even when the conduct alleged to constitute unfair competition violates a statute that does not provide a private right of action."

Defendant contends that certain unidentified regulations confer on it "'discretion' to approve or deny loan applications."  ECF 24-1 at 25.  But Defendant has never claimed to have "approved" or "denied" any of Plaintiffs' loans -- it claims that they are merely "delayed."  The defendant in *Ellsworth v. U.S. Bank, N.A.,* 908 F. Supp. 2d 1063, 1089 (N.D. Cal. 2012), likewise argued at the dismissal stage "that it did nothing more than what was authorized by statute."  The court held that "[t]hough that may be true, it is a fact question to be answered in discovery, not the basis for a motion to dismiss."  *Id.*  In contrast, Defendant cites cases where defendants' compliance with the relevant statutes was clear from the records before the courts. *See Loeffler v. Target Corp.,* 324 P.3d 50, 76–77 (Cal. 2014); *Lopez v. World Sav. & Loan Ass'n*, 105 Cal. App. 4th 729, 741-42 (2003).

Plaintiffs Marshall and Townsend also properly allege that Defendant's misconduct was unfair under the UCL.  Defendant correctly recognizes that a UCL claim may exist when "the

27

alleged unfairness is 'tethered to some legislatively declared policy.'" ECF 24-1 at 26. Defendant also properly cites the "legislatively declared policy" relevant to this case: "encouraging SBA-approved lenders to issue PPP loans to as many eligible borrowers as possible, with a particular focus on reaching the smallest businesses …." ECF 24-1 at 4.

Consistent with those principles, California courts have repeatedly upheld UCL claims against financial institutions. For example in *Harris v. Bank of Am. Corp.*, 2014 WL 1116356, at *12 (C.D. Cal. Mar. 17, 2014), the court rejected dismissal of a UCL claim alleging "behavior … which violates the public policy undergirding the HAMP." *See also Hofstetter v. Chase Home Fin., LLC*, 2010 WL 3259773, at *14-15 (N.D. Cal. Aug. 16, 2010) (finding unfair conduct by reference to National Flood Insurance Act regulations); *Miller v. Bank of Am. N.T. & S.A.*, 2004 WL 2403580, at *21 (Cal. Super. Ct. Oct. 13, 2004) (unfair conduct in bank's deduction of fees from Social Security payments). Defendant's cases, by contrast, do not involve violations of law and are  factually distinguishable. For example, the court in *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 374–75 (Cal. Ct. App. 2001), held the defendant's conduct was permissible by reference to established judicial doctrine. Nothing comparable authorizes Defendant's conduct in this case.

Plaintiffs also sufficiently allege equitable relief under the UCL in the alternative. ¶ 247. Defendant cites *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 842–44 (9th Cir. 2020), to argue that "federal courts must follow federal law that equitable relief is only available where the plaintiff *establishes* they lack an adequate remedy at law." ECF 24-1 at 27 (emphasis added). But neither *Sonner* nor Defendant's statement of its holding address what is required at the pleading stage. For that reason, Ninth Circuit courts have repeatedly held that *Sonner* has no bearing, as here, at the pleading stage. *See, e.g., Jeong v. Nexo Financial LLC,* 2022 WL

28

174236, at *27 (N.D. Cal. Jan. 19, 2022) (citing cases); *Rothman v. Equinox Holdings, Inc.*, 2021 WL 1627490, at *12 (C.D. Cal. Apr. 27, 2021).

Although *Sonner* did not involve a motion to dismiss, Fed. R. Civ. P. 8(a)(3) indisputably does apply and expressly provides that "a demand for relief sought … may include relief in the alternative." That is exactly what Plaintiffs have done. *See* ¶ 247, Prayer for Relief ¶ E. *See also Flynn-Murphy v. Jaguar Land Rover N. Am., LLC*, 2021 WL 5448716 at *12 & n.7 (D.N.J. Nov. 19, 2021) (citing Rule 8(a)(3), distinguishing *Sonner* and denying motion to dismiss); *Pierre v. Healthy Beverage, LLC*, 2022 WL 596097, at *14 (E.D. Pa. Feb. 28, 2022) ("When it remains unclear whether legal remedies will prevail, there is no need to dismiss an alternatively pleaded" claim for equitable relief); *Nacarino v. Chobani, LLC*, 2022 WL 344966, at *10 (N.D. Cal. Feb. 4, 2022) (quoting Rule 8, holding *Sonner* inapplicable at the pleading stage); *Preston Grp., LLC v. Customers Bank*, 2021 WL 3562893, at *8 (E.D. Pa. Aug. 12, 2021) (a "plaintiff may plead both" breach of contract and equitable relief claims).

As this Court held in *Isaac's Deli, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 539 F. Supp. 3d 424, 432 n.4 (E.D. Pa. 2021), "the Court must engage in an individualized review of the facts at bar and the applicable binding authority to render an independent judgment regarding the particular controversy before it." Here, Rule 8 is the "applicable binding authority" and Plaintiffs have complied with it.

Defendant's other contentions do not support dismissal. Defendant again ignores the SBA's approval of Plaintiffs' loans in contending that Plaintiffs have no vested interest in the loan proceeds. Defendant cites a single unpublished case to argue that "a plaintiff cannot obtain restitution to disgorge the defendant of money it received from a third party." ECF 24-1 at 28. But the court in *Kivett v. Flagstar Bank, FSB*, 506 F. Supp. 3d 749, 763 (N.D. Cal. Dec. 10,

29

2020), held that "[t]he concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person." *Accord Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003) ("[u]nder the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant *or* benefits in which the plaintiff has an ownership interest"); *In re Processed Egg Products Antitrust Litig.*, 851 F. Supp. 2d 867, 897 (E.D. Pa. 2012) (Pratter, J.) (denying dismissal of UCL claim that relied on payments to defendants from non-parties). Plaintiffs' UCL claims are also sufficiently alleged.

### 2.   The Illinois Subclass

Defendant contends that Plaintiff Ahmadou's ICFA claim duplicates his breach of contract claim.[3]  But whereas Plaintiffs' contract claims rely on standard and uniform contract principles, plaintiff Ahmadou's ICFA claim arises from Defendant having induced him to enter into the Loan Agreement, absent any intention of fulfilling the overriding purpose of it, by accepting plaintiff's application and the SBA's approval and by also thereby locking plaintiff into relying exclusively on Defendant for his loan.

These allegations sufficiently allege a plausible ICFA claim.  *See, e.g.*, *Bakopoulos v. Mars Petcare US, Inc.*, 2021 WL 2915215, at *5 (N.D. Ill. July 12, 2021) ("affirmative acts of misrepresentation made by defendants who knowingly induce consumers to enter contracts can support an [ICFA] claim"); *Powell v. Subaru of Am., Inc.*, 502 F. Supp. 3d 856, 890 (D.N.J. 2020) ("Plaintiffs' statutory fraud claims here are certainly not … centered on a mere breach of contract")*; Santangelo v. Comcast Corp.,* 162 F. Supp. 3d 691, 704 (N.D. Ill. 2016) (accord).  By contrast, Defendant's cases did not involve alleged misconduct apart from the contract.  *See*

---

[3]     Defendant incorrectly refers to "Plaintiffs'" ICFA claim (ECF 24-1 at 29).  Only plaintiff Ahmadou, an Illinois resident (¶ 16), alleges this claim.  *See* ¶¶ 249-262.

*Turner v. Orthopedic & Shoulder Ctr., S.C.*, 2017 IL App (4th) 160552, ¶ 46, 82 N.E.3d 801, 807–08 (plaintiff did not allege misconduct in inducing her to enter into contract); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 843 (Ill. 2005) (plaintiff disavowed any reliance on defendant's misconduct in sale of policy at issue); *Cafferty Clobes Meriwether & Sprengel, LLP v. XO Communs. Servs.*, 190 F. Supp. 3d 765, 772 (N.D. Ill. 2016) (plaintiff asserted ICFA claim based strictly on terms of contract).

Defendant's contention that plaintiff Ahmadou's ICFA claim is governed by Rule 9(b) is likewise misplaced.  The ICFA provides redress for both deceptive and unfair business practices, and plaintiff alleges that Defendant's violations were unfair (*see, e.g.*, ¶ 256) as to which Rule 9(b) does not apply.  *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738-739 (7th Cir. 2019). ("To determine whether a practice is unfair, Illinois courts consider three factors: whether it "*offends public policy*"; is "immoral, unethical, oppressive, or unscrupulous"; *or* "*causes substantial injury to consumers.*"  A plaintiff need not satisfy all three factors; "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.") (emphasis added).

Plaintiff Ahmadou has sufficiently alleged that Defendant's actions were "unfair" even if there is an element of deception in those actions.  Courts have repeatedly upheld similar ICFA claims at the pleading stage where, as here, the misconduct at issue would, if proven, offend public policy.  *See, e.g.*, *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002 (7th Cir. 2018) (reversing dismissal; plaintiff alleged that "MetLife engaged in a bait-and-switch strategy, which (if proven) would offend Illinois's public policy"); *Saika v. Ocwen Loan Servicing, LLC*, 357 F. Supp. 3d 704, 717-718 (N.D. Ill. 2018)(denying motion to dismiss; "[a]n [ICFA] unfairness

31

claim may … rest on violations of administrative directives … that themselves do not permit private enforcement").

The inability of plaintiff Ahmadou and other borrowers to seek other PPP loans once contracted with Defendant is likewise unfair and oppressive within the meaning of the ICFA. As the court stated in *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 631 (N.D. Ill. 2019):

> "For purposes of ICFA, 'a practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer.' Here, a jury could reasonably have concluded that Ocwen's conduct left Saccameno with a lack of meaningful choice. After all, Saccameno … had no ability to get rid of Ocwen after it began mishandling her account. … , in any case, can there can be any doubt that Ocwen's conduct placed an "unreasonable burden" on Saccameno…because of Ocwen's failure to fix errors that, to all appearances, could have been fixed in a matter of hours, if not minutes."

And even if Defendant was correct that Rule 9(b) applied, plaintiff Ahmadou alleges his ICFA claim with sufficient particularity. Assuming the truth of the facts alleged, Defendant's scheme to obtain PPP loan fees on PPP loans it failed to disburse alone represents oppressive and potentially even criminal behavior. And Defendant still has failed to account for (or produce any discovery concerning) the large PPPLF loan principal advances it obtained but failed to fund to plaintiff Ahmadou and borrowers nationwide. The fact that plaintiff Ahmadou does not yet know "the 'who, what, when, where, and how'" (ECF 24-1 at 30) or even current status of those funds, or to whom Defendant may have diverted them, does not render the claim deficient; indeed, that information is already in Defendant's possession.

32

### 3.    The Ohio Subclass

Defendant argues that plaintiff Stalnaker[4] fails to allege "the kind of commercial injury necessary to state a claim under the ODTPA." ECF 24-1 at 31. But the words and purpose of the statute reflect otherwise.

Ohio Rev. Code Ann. § 4165.01(D) provides that "'Person' means an individual … or any other legal or commercial entity," *i.e.*, an individual may be considered to be a commercial entity for the purposes of the statute. Ohio Rev. Code Ann. § 4165.03(A)(2), in turn, provides that "[a] person who is injured by a person who commits a deceptive trade practice … may commence a civil action to recover actual damages from the person who commits the deceptive trade practice." Even Defendant's own case is in accord. *See Torrance v. Rom*, 157 N.E.3d 172, 188 (Oh. App. 2020) ("[T]he definition of 'person' in the ODTPA qualifies the list of individuals and entities permitted to sue with the phrase 'or any other legal or commercial entity.' This phrase implies that an individual may bring suit under the ODTPA in his or her "'capacity as a participant in commercial activity.'"). *Accord Gascho v. Glob. Fitness Holdings, LLC,* 863 F. Supp. 2d 677, 698 (S.D. Ohio 2012).

Plaintiff Stalnaker did not "artfully" omit the word "consumer" from her ODPTA count as Defendant falsely contends (*see* ECF 24-1 at 32), but instead alleges a claim entirely consistent with the words of the statute. Nor can there be any reasonable dispute that PPP loans

---

[4]    Defendant again incorrectly states that "Plaintiffs" (ECF 24-1 at 31) allege the Ohio state law claim. Only plaintiff Stalnaker, who resided in Ohio for her PPP loan (¶ 20), alleges the ODTPA claim. ¶¶ 264-265. Defendant is correct concerning the caption in Count Four of Plaintiffs' Amended Complaint (ECF 24-1 at 31) as plaintiff Stalnaker alleges claims only under the ODTPA and as the actual text of that Count makes clear. *See* ¶¶ 264-272. The cases Defendant cites in section VII A of its brief (ECF 24-1 at 31) are therefore irrelevant.

33

fall within any definition of commercial activity, as a central purpose of the PPP was to help small businesses amid the COVID pandemic. *See* ¶¶ 28, 31.

Plaintiff Stalnaker's allegations are sufficient to state an ODTPA claim. The court in *Torrance,* 157 N.E.3d at 188, specified the elements of such a claim:

> "(1) a false statement or statement that is misleading, (2) which statement actually deceived or has the tendency to deceive a substantial segment of the target audience, (3) the deception is material in that it is likely to influence a purchasing decision, and (4) the plaintiff has been or is likely to be injured as a result."

Like the ICFA claim, plaintiff Stalnaker's ODTPA claim arises from Defendant's having induced her and other Ohio borrowers to enter into the Loan Agreements without intending to perform, and by locking them in and thereby precluding them from going elsewhere for a PPP loan. Those actions sufficiently allege the first three elements of Defendant's ODTPA violation. *See, e.g., He v. Rom*, 2016 WL 5682012, at *4 (N.D. Ohio Oct. 3, 2016) (allegations that defendants' "service was not as the Defendants represented it to be" sufficient to confer standing). Defendant's failure to fund the PPP loans of plaintiff Stalnaker and other similarly situated Ohio borrowers constitutes the requisite injury.

Hence, even if Plaintiff Stalnaker's ODTPA claim arose from Defendant's breach of her Loan Document contract alone, she still has sufficiently alleged a plausible ODTPA claim. Defendant's case, *JP Morgan Chase Bank, N.A. v. Safeco Ins. Co. of Am.*, 2012 WL 1945604, at *4-5 (N.D. Ohio May 30, 2012), by contrast, turned on plaintiff's failure to present "evidence that Safeco had any intent … to breach the contract, or any knowledge that the representations contained in the contract documents would turn out to be false."

Conclusion

For the foregoing reasons, the Court should deny Defendant's motion to dismiss in full.

Alternatively, if the Court is inclined to dismiss any of Plaintiffs' claims, the Court should do so

without prejudice and grant Plaintiffs leave to file an amended complaint.

Dated:  March 10, 2022                          **BAILEY & GLASSER LLP**


                                                By: /s/ *Lawrence J. Lederer*
                                                     Lawrence J. Lederer (Pa. ID 50445)
                                                     Michael L. Murphy (admitted *pro hac vice*)
                                                     Bart D. Cohen (Pa. ID 57606)
                                                     1055 Thomas Jefferson Street NW, Suite 540
                                                     Washington, DC 20007
                                                     T.: 202.463-2101
                                                     F.: 202.463-2103
                                                     llederer@baileyglasser.com
                                                     mmurphy@baileyglasser.com
                                                     bcohen@baileyglasser.com


                                                            and

                                                **NOLAN HELLER KAUFFMAN LLP**
                                                Justin A. Heller (admitted *pro hac vice*)
                                                Matthew M. Zapala (admitted *pro hac vice*)
                                                80 State Street, 11th Floor
                                                Albany, NY 12207
                                                T.: 518.449.3300
                                                F.: 518.432.3123
                                                jheller@nhkllp.com
                                                mzapala@nhkllp.com

                                                *Attorneys for Plaintiffs and the Proposed Classes*

35

<u>Certificate of Service</u>

I hereby certify that, on March 10, 2022, I caused Plaintiffs' Memorandum of Law in

Opposition to Prestamos CDFI, LLC's Motion to Dismiss Plaintiffs' Amended Complaint to be

filed on the Court's CM/ECF system and for service of same on all counsel of record.


                                        */s/ Lawrence J. Lederer*
                                        Lawrence J. Lederer